Opinion issued August 28, 2009









In The

Court of Appeals

For The

First District of Texas






NO. 01-08-00205-CR






LAMAR DUNTA PERKINS, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 262nd District Court

Harris County, Texas

Trial Court Cause No. 1135198






MEMORANDUM OPINION ON MOTION FOR REHEARING


 On July 16, 2009, we issued a memorandum opinion overruling appellant's
four points of error and affirming the trial court's judgment. Appellant has filed a
motion for rehearing, arguing that this Court failed to address whether dog scent
evidence is a legitimate field of expertise. We deny appellant's motion for rehearing. 
Tex. R. App. P. 49.3. We withdraw our July 16, 2009 memorandum opinion and
judgment and substitute this memorandum opinion and judgment in their place. 

 A jury convicted appellant, Lamar Dunta Perkins, of burglary of a habitation (1)
and sentenced him to nine years in prison. In four points of error, appellant argues
that (1) the trial court erred in admitting dog scent evidence; (2) his trial counsel was
ineffective in failing to object to the admission of dog scent evidence; (3) his right to
confrontation was violated when the trial court admitted the dog scent evidence; and
(4) the evidence presented at trial was factually insufficient to support the conviction.

 We affirm the judgment of the trial court. 

Background

 On September 28, 2007, at approximately 10:30 a.m., William Claymore, the
complainant, received a phone call from his bank, alerting him that his Bank of
America VISA credit card had been used that morning at two separate locations near
his home on Val Verde Street in Houston, Texas. The complainant never used the
card and had secured it inside a fireproof box in a closet in the music room of his
house. The complainant assumed that his home had been burglarized. He called his
wife and went to his home. She called the Houston Police Department ("HPD"). 
HPD Officer H. Pham arrived at the crime scene to investigate. The complainant told
Officer Pham that there were signs of forced entry in the back of the house because
the back window of the house was broken. Officer Pham called for backup and
inspected the crime scene. The house was disheveled and the fireproof box was
among the missing items. The complainant kept several items in the fireproof box,
including a jump drive, a checkbook, credit cards, and copies of insurance policies. 
The complainant also discovered that several other items were missing, including two
electric guitars, one amplifier, a handgun, a digital camera, and his wife's ring.

 Officer Pham inspected the backyard and discovered that the complainant's
fence had been breached. One of the complainant's amplifiers was found in his
backyard along the fence line. Behind the complainant's fence was the apartment
complex where appellant resided. The complainant's wife walked over to the
apartment leasing office to alert them that her house had been burglarized and to
inquire about any suspicious activity during the morning of the burglary. The office
manager told the complainant's wife that she had gone to an apartment to serve an
eviction notice and had seen electric guitars left outside the apartment. After
receiving the information about the electric guitars from his wife, the complainant
called HPD again. 

 As the complainant was calling HPD, he observed three men loading vehicles
for at least one and one-half hours. He saw two of the men, Abel Turner and Steven
Humphries, carrying his two electric guitars and walking toward him. The
complainant told the HPD dispatcher that he was in pursuit of two people who had
burglarized his house. The HPD dispatcher believed that the complainant was
reporting an armed robbery and sent several police cars to the scene. The HPD police
pursued the two men and captured them.

 While the police were in pursuit of the two men with the guitars, appellant was
standing outside his apartment. After police arrested the two men, they approached
appellant and questioned him. Police observed that appellant was carrying an object
in his hand and instructed him to release the object. Police recovered two objects,
namely the complainant's jump drive and a pawn shop receipt. Appellant told police
that the complainant had given him the jump drive. In response to further questions,
appellant told police that Turner had given him the items and that he had never
entered the complainant's house. The pawnshop receipt named appellant as the
person who had pawned the item, namely a ring. The complainant's wife
accompanied police to the pawn shop, where she identified and recovered her ring. 
Police also retrieved appellant's picture identification number from the pawnshop. 
Based on this information, appellant was charged with theft.

 Later, HPD officers C. Truhan and K. Fehr went to the crime scene to collect
evidence. Officers Truhan and Fehr collected three samples of scent evidence by
rubbing gauze pads over several areas in the complainant's house, including the
closet area of the music room where the complainant kept his fireproof box. Officer
Truhan then placed the samples in bags and labeled them. Officer Truhan also
searched for fingerprints but found no usable fingerprints at the crime scene. She
took the samples of scent evidence to the HPD property room. Officer Fehr also took
samples of scent evidence from appellant, Turner, and Humphries. He swabbed each
subject's arm with a gauze pad to pick up perspiration. He then placed the samples
into plastic bags and labeled each bag with the corresponding subject's name.

 On September 29, 2007, HPD contacted Fort Bend County Sheriff's Deputy
K. Pikett and asked him to analyze the samples of scent evidence obtained by Officer
Truhan. Deputy Pikett's expertise involves the use of bloodhounds to analyze scent
evidence. Deputy Pikett and his wife brought the following bloodhounds to the HPD
Westside Station to analyze the scent evidence: an 11-year-old female named Quincy,
a 3-year-old male named James Bond, and a 2-year-old female named Clue. Deputy
Pikett and his wife went to the rear parking lot of the police station with the
bloodhounds and set up six silver canisters side by side ten feet apart. HPD Officer
R. Clements, an investigator with the robbery and theft division, gave Deputy Pikett
the scent evidence obtained by Officer Truhan. Deputy Pikett asked for the racial and
gender characteristics of the suspects.

 When told that appellant, Turner, and Humphries were all black males, Deputy
Pikett retrieved three black male control samples from his vehicles. Deputy Pikett
placed the samples obtained by Officer Truhan in the silver canisters. He placed
Humphries' sample in the second canister, appellant's sample in the fifth canister, and
Turner's sample in the sixth canister. He then placed the three black male control
samples in the remaining canisters. After Deputy Pikett placed all the samples in the
canisters, his wife placed the canisters in a random order, rendering Deputy Pikett
without knowledge of the particular location of any given sample. Deputy Pikett
allowed each bloodhound to sniff the sample taken from the closet in the music room
of the complainant's house. Each of the three bloodhounds alerted that all three
suspects had been in the complainant's house. Based on the results of the "scent
lineup," appellant's charges were changed to burglary of a habitation.

 Trial began on March 7, 2008. At trial, the State presented testimony from
Deputy Pikett. Deputy Pikett testified that he has been training bloodhounds since
1989. He has previously used his bloodhounds in federal cases with the Federal
Bureau of Investigations, the Bureau of Alcohol, Tobacco, and Firearms, the United
States Postal Service, and the Drug Enforcement Agency. He also testified that he
had used his bloodhounds on state and local cases with the Texas Rangers and local
law enforcement agencies. Quincy had worked on 1,740 cases; James Bond had
worked on 1,160 cases; Clue had worked on 564 cases. He testified that he has never
been admitted as an expert in dog scent lineups. However, the evidence he has
obtained by dog scent lineups have been upheld by several Texas Courts of Appeals.

 Deputy Pikett testified that he begins training a bloodhound when it is eight
weeks old. He takes the bloodhound to his backyard and holds a handkerchief in
front of it. He waves the handkerchief and drops it on the ground as he runs away
from it. The purpose of this exercise is to condition the bloodhound to "chase and
catch." He testified that he places food in his pocket to encourage the animal to sniff
out the food. When the bloodhound finds the food in Deputy Pikett's pocket, he
rewards the animal with the food and displays of affection. As the training
progresses, Deputy Pikett testified,

 We want [the bloodhounds] when they get older, if they trailed to a
group of people on some criminal case, it's not going to work that they
get there and go one of these people is the criminal. We need them to
go up and put their nose on the person. . . . Don't just go and say one of
these people is the bad guy, we want you to put your nose on them.


Deputy Pikett also testified that if he uses a bloodhound on a burglary case and he
wants to detect a scent on a specific item that may have been in contact with several
members of the household and the suspect, he wipes the item with a gauze pad and
allows the bloodhound to sniff the pad. He brings the bloodhound to the scene to
sniff all members of the burglarized household. The bloodhound then uses a process
of elimination method called "missing member" to bypass the scents of the members
of the household and focus on the scent of the person not present, namely the suspect.
The bloodhound then begins to trail the scent of the suspect. Deputy Pikett testified
that "a bloodhound is the Ferrari of the noses" compared to the capacity of other
breeds to detect human scents. He testified that "none of the dogs do scent lineups
at all until they can show great reliability training." The animal must demonstrate
"scent discrimination," the ability to distinguish among several human scents present
in an urban or suburban setting.

 Deputy Pikett testified that he conducts two types of dog scent lineups: person
lineups and pad lineups. With pad lineups, such as the one used in this case, Deputy
Pikett is contacted after a suspect has been identified. He uses six quart-size canisters
numbered one through six and places the canisters in a position "perpendicular to the
wind" to avoid cross-contamination. He places control samples matching the
suspect's race and gender characteristics in five of the six canisters and places a
sample of the suspect's scent in the sixth canister. He then allows a bloodhound to
sniff a sample of a scent taken from a piece of evidence at the crime scene. He walks
the bloodhound near the six canisters and it alerts when it detects a scent matching
the scent taken from the crime scene. Deputy Pikett testified that each bloodhound
alerts to a scent differently. Clue stands in front of the canister and wags her tail. She
then jumps in Deputy Pikett's lap. James Bond turns around 90 degrees from the
canister and shakes. Quincy turns around 90 degrees and barks. In this case, the
three bloodhounds alerted to appellant's scent when they were given a sample of the
scent taken from the music room where the complainant kept his safe, his credit cards,
his jump drive, his electric guitars, his MP3 player, and his checkbook. 

 Appellant presented testimony from Turner. Turner testified at trial that
appellant did not enter the complainant's house. In connection with his guilty plea,
however, Turner stipulated that he had committed the burglary with appellant. Turner
testified that he was lying at the time he made his guilty plea. He testified that
appellant was babysitting his child at the apartment of the child's mother during the
morning prior to the burglary. Turner testified that he broke into the complainant's
house and took the missing items over three trips to and from the apartment complex
behind the complainant's house. He gave appellant several items from the burglary,
including several rings. Appellant also presented testimony from Tiffany Hall. Hall
testified that she saw appellant babysitting his child at 8 a.m and at 10:30 a.m on the
morning of the burglary. 

 On March 12, 2008, the jury convicted appellant of burglary of a habitation and
sentenced him to 9 years in prison. Appellant gave notice of appeal. 

Admissibility of Dog Scent Evidence

 In his first point of error, appellant argues that the trial court erred in admitting
the dog scent evidence. 

 If, on appeal, a defendant claims the trial judge erred in admitting evidence
offered by the State, this error must have been preserved by a proper objection and
a ruling on that objection. See Tex. R. App. P. 33.1; Tex. R. Evid. 103; Martinez v.
State, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); Ethington v. State, 819 S.W.2d
854, 858 (Tex. Crim. App. 1991).

 Here, appellant's trial counsel stated that he had no objections when the State
introduced the dog scent evidence. The trial court admitted the evidence. Therefore,
appellant failed to preserve error. Tex. R. App. P. 33.1; Tex. R. Evid. 103; Martinez,
98 S.W.3d at 193; Ethington, 819 S.W.2d at 858.

 We overrule appellant's first point of error. 

Ineffective Assistance of Counsel

 In his second point of error, appellant argues that trial counsel was
constitutionally ineffective in failing to object to the trial court admission of Deputy
Pikett's testimony regarding the "scent lineup" evidence used to implicate appellant
in the offense. 

 Standard of Review

 We evaluate the effectiveness of counsel under the two-pronged test enunciated
in Strickland v. Washington, 466 U.S. 668, 690, 104 S. Ct. 2052, 2066 (1984);
Hernandez v. State, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999). First, an appellant
must show that his trial counsel's representation fell below an objective standard of
reasonableness. Strickland, 466 U.S. at 688, 104 S. Ct. at 2064. To prove this
deficiency in representation, an appellant must demonstrate that his counsel's
performance deviated from prevailing professional norms. Id. at 688, 104 S. Ct. at
2065. Second, he must show prejudice. Id. at 693, 104 S. Ct. at 2067. To show
prejudice, an appellant must show a reasonable probability that, but for his counsel's
unprofessional errors, the result of the proceeding would have been different. Id. at
694, 104 S. Ct. at 2068. When an appellant fails to satisfy one prong of the
Strickland test, the reviewing court need not consider the other prong. Id. at 697, 104
S. Ct. at 2069. 

 We cannot speculate beyond the record provided; rather, a reviewing court
must presume that the actions were taken as part of a strategic plan for representing
the client. Rylander v. State, 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003). 
Ineffective assistance of counsel claims must be firmly founded in the record. Bone
v. State, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). That record must itself
affirmatively demonstrate the alleged ineffectiveness. Id. at 836-37. A defendant
must prove, by a preponderance of the evidence, that there is, in fact, no plausible
professional reason for a specific act or omission. Id. at 836. When no reasonable
trial strategy could justify the trial counsel's conduct, counsel's performance falls
below an objective standard of reasonableness as a matter of law, regardless of
whether the record adequately reflects the trial counsel's subjective reasons for acting
as he did. Andrews v. State, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).
 When trial counsel fails to object to the admission of novel scientific evidence,
he is within bounds of professional competence in not making an objection if the
State could have established that the novel scientific evidence is relevant and not
barred by the Texas Rules of Evidence. Patrick v. State, 906 S.W.2d 481, 496 (Tex.
Crim. App. 1995). If trial counsel reasonably perceives that an objection to novel
scientific evidence would be frivolous, he is within the bounds of professional
competence if he fails to object to the admission of the evidence. Id. 

 Here, trial counsel failed to object to the admission of expert testimony
regarding the results of the scent lineup, which appellant contends produced the sole
evidence that resulted in his being charged with burglary of a habitation in addition
to the original charge of theft. We therefore examine whether expert testimony of
dog scent evidence in this case was admissible. 

 Admissibility of Dog Scent Evidence

 We review a trial court's decision to admit or exclude scientific expert
testimony under an abuse of discretion standard. Sexton v. State, 93 S.W.3d 96, 99
(Tex. Crim. App. 2002); see also Weatherred v. State, 15 S.W.3d 540, 542 (Tex.
Crim. App. 2000). If the trial court's ruling is within the zone of reasonable
disagreement, then the trial court's ruling will be upheld. Sexton, 93 S.W.3d at 99.

 Application of Rule 702 

 Texas Rule of Evidence 702 states, "If scientific, technical, or other specialized
knowledge will assist the trier of fact to understand the evidence or to determine a
fact in issue, a witness qualified as an expert by knowledge, skill, experience,
training, or education, may testify thereto in the form of an opinion or otherwise."
Tex. R. Evid. 702; Sexton, 93 S.W.3d at 99. The Court of Criminal Appeals has
recognized that the threshold determination for a trial court to make regarding the
admission of expert testimony is whether that testimony will help the trier of fact
understand the evidence or determine a fact in issue. Kelly v. State, 824 S.W.2d 568,
572 (Tex. Crim. App. 1992). Thus, in a case such as this, where the trial court is
faced with an offer of expert testimony on a scientific topic unfamiliar to lay jurors,
the trial court's first task is to determine whether the testimony is sufficiently reliable
and relevant to help the jury in reaching accurate results. Id. 

 In Kelly, the Court of Criminal Appeals held, "Evidence derived from a
scientific theory, to be considered reliable, must satisfy three criteria in any particular
case: (a) the underlying scientific theory must be valid; (b) the technique applying the
theory must be valid; and () the technique must have been properly applied on the
occasion in question." Id. at 573. Non-exclusive factors that could affect a trial
court's determination of reliability include "(1) the extent to which the underlying
scientific theory and technique are accepted as valid by the relevant scientific
community, if such a community can be ascertained; (2) the qualifications of the
expert(s) testifying; (3) the existence of literature supporting or rejecting the
underlying scientific theory and technique; (4) the potential rate of error of the
techniques; (5) the availability of other experts to test and evaluate the technique; (6)
the clarity with such the underlying scientific theory and technique can be explained
to the court; (7) the experience and skill of the person(s) who applied the technique
on the occasion in question." Id. 

 When expert testimony addresses fields of study aside from the hard sciences,
such as the social studies or fields that are based primarily upon experience and
training as opposed to the scientific method, however, the reliability standard set out
in Kelly applies with less rigor. Nenno v. State, 970 S.W.2d 549, 561 (Tex. Crim.
App. 1998), overruled on other grounds by State v. Terrazas, 4 S.W.3d 720 (Tex.
Crim. App. 1999); Trejos v. State, 243 S.W.3d 30, 49 (Tex. App.--Houston [1st
Dist.] 2007, pet. ref'd); Winston v. State, 78 S.W.3d 522, 526 (Tex. App.--Houston
[14th Dist.] 2002, pet. ref'd). 

 In Nenno, the Court of Criminal Appeals stated that the appropriate questions
for assessing reliability when addressing fields that are primarily based upon
experience and training are: (1) whether the field of expertise is a legitimate one; (2)
whether the subject matter of the expert's testimony is within the scope of the field;
and (3) whether the expert's testimony properly relies upon or utilizes the principles
involved in the field. Nenno, 970 S.W.2d at 561; Trejos, 243 S.W.3d at 49; Winston,
78 S.W.3d at 526. The Fourteenth Court of Appeals adopted the less rigorous Nenno
test when reviewing the reliability of expert testimony that describes a dog's alert to
a scent. Winston, 78 S.W.3d at 526. This Court likewise has adopted the Winston
application of the Nenno test to expert testimony that describes a dog's alert to a
scent. Trejos, 243 S.W.3d at 49; see also Risher v. State, 227 S.W.3d 133, 136-37
(Tex. App.--Houston [1st Dist.] 2006, pet. ref'd). 

 Appellant challenges the first and third prongs of the Nenno test. Appellant
challenges the evidence on the first prong of the Nenno test, which requires the court
to determine whether the field of expertise is a legitimate one. Nenno, 970 S.W.2d
at 561; Winston, 78 S.W.3d at 527. 

 1. Legitimacy of Dog Scent Lineups

 In Winston, the Fourteenth Court of Appeals observed that thirty seven states
and the District of Columbia admit scent tracking evidence to prove identity. 78
S.W.3d at 527. It concluded that there was little difference between a scent lineup
and scent tracking, "where a dog is required to track an individual's scent over an
area traversed by multiple persons." Id. Therefore, the court concluded that the use
of scent lineups was a legitimate field of expertise. Id. In Winston, Pikett used the
same type of scent pad lineup that was used in the instant case and one of the same
dogs, Quincy. Id. at 528-59. This Court, like the Fourteenth Court of Appeals,
subsequently adopted the Nenno test for determining the admissibility of scent-lineup
evidence. Risher, 227 S.W.3d at 136-37; Trejos, 243 S.W.3d at 49. In both of those
cases, the defendant challenged only the third prong of the Nenno test rather than, as
here, the first prong. See Risher, 227 S.W.3d at 136-37; Trejos, 243 S.W.3d at 49. 
However, in both cases, this Court held that Pikett's scent lineup testimony was
admissible. Trejos, 243 S.W.3d at 54; Risher, 227 S.W.3d at 138. Admittedly, in
Risher, Pikett used a live lineup rather than a lineup using only scent pads and a
different dog, Lucy. 227 S.W.3d at 137-38. Trejos involved Pikett's use of Chloe
and another dog, Missy, as cadaver dogs to determine whether the complainant's
body had been where the defendant indicated he had left it, and both independently
alerted at the same spot. 243 S.W.3d at 38. However, despite these distinctions, we
cannot say that appellant's counsel was ineffective in failing to object to the
legitimacy of dog-scent evidence that had been held admissible by both the
Fourteenth Court of Appeals and this Court in similar cases and that no Texas court
had ruled inadmissible.

 2. Reliance upon Principles Used in the Field of Expertise

 Appellant also challenges his trial counsel's competence in failing to object to
the dog scent evidence under the third prong of Nenno, which requires the court to
determine whether the proffered testimony properly relies upon or utilizes the
principles involved in the field of expertise. 

 In Winston, the Fourteenth Court of Appeals held that three factors must be
used to determine whether the proffered expert testimony properly relies upon or
utilizes principles involved in dog-scent lineups: (1) the qualifications of the
particular trainer; (2) the qualifications of the particular dog; and (3) the objectivity
of the particular lineup. Winston, 78 S.W.3d at 527. In Winston, Deputy Pikett was
found to be a qualified trainer of bloodhounds and Quincy was found to be a dog
qualified to detect human scent. Id. at 527-28. Appellant concedes that Deputy
Pikett is qualified to train bloodhounds and the dogs used here are qualified to detect
human scent. Appellant argues, however, that the pad lineup used here was not
objective.

 Deputy Pikett testified that he uses pad lineups when the police have already
identified a suspect, as in this case. In Winston, the Fourteenth Court of Appeals
upheld the trial court's ruling to admit evidence from a pad lineup, performed
similarly to the pad lineup in this case. Id. at 528. We conclude, therefore, that
appellant has failed to carry his burden of showing that the dog scent evidence
admitted in this case was inadmissible. See Patrick, 906 S.W.2d at 496. At most,
appellant has shown weaknesses in the testimony that provide a basis for cross-examination, but he has not shown that its admission is outside the zone of reasonable
disagreement. Therefore, we hold that appellant has failed to satisfy the first prong
of Strickland. See Strickland, 466 U.S. at 688, 104 S. Ct. at 2064. 

 We overrule appellant's second point of error.

Confrontation Clause

 In his third point of error, appellant argues that his right to confrontation was
violated when the trial court admitted the dog scent evidence because he did not have
the opportunity to cross-examine the bloodhounds and because he had no video
recording of the scent lineup.

 If, on appeal, a defendant claims his right to confrontation has been violated,
this error must have been preserved by a proper objection and a ruling on that
objection. Tex. R. App. P. 33.1; Holland v. State, 802 S.W.2d 696, 700 (Tex. Crim.
App. 1991); Campos v. State, 186 S.W.3d 93, 98 (Tex. App.--Houston [1st Dist.]
2005, no pet.) ("The right of confrontation is vital to an ordered criminal justice
system, but it is nonetheless a trial right, and a defendant waives his right to confront
witnesses if he does not object at trial."). 

 Here, appellant's trial counsel stated that he had no objections when the State
introduced the dog scent evidence. The trial court admitted the evidence. Therefore,
appellant failed to preserve error. Tex. R. App. P. 33.1; Holland, 802 S.W.2d at 700;
Campos, 186 S.W.3d at 98.

 We overrule appellant's third point of error. 

Factual Sufficiency

 In his fourth point of error, appellant argues that the evidence presented at trial
was factually insufficient to sustain his conviction. 

 Standard of Review

 A factual sufficiency review involves three ground rules. Lancon v. State, 253
S.W.3d 699, 704 (Tex. Crim. App. 2008). First, we must recognize that a jury has
already passed on the facts, and we must accord the jury the proper deference to avoid
substituting our judgment for that of the jury. Id. at 704-05 (citing Clewis v. State,
922 S.W.2d 126 (Tex. Crim. App. 1996)). Second, where we find the facts
determined by the jury to be insufficient to affirm a conviction, we must clearly lay
out and explain how the evidence supporting the verdict is too weak on its own to
support it, or how contradicting evidence greatly outweighs evidence supporting the
verdict. Id. at 705. Finally, we view all of the evidence in a neutral light when
conducting this review. Id. We may only set aside a verdict where the evidence
supporting the verdict is so weak as to render the verdict clearly wrong or manifestly
unjust. Id. (citing Cain v. State, 958 S.W.2d 404, 406 (Tex. Crim. App. 1997)). A
jury is in the best position to evaluate the credibility of witnesses, and we are required
to afford "due deference" to the jury's determinations. Marshall v. State, 210 S.W.3d
618, 625 (Tex. Crim. App. 2006). 

 A person commits burglary if, without the effective consent of the owner, the
person enters a habitation, or a building or any portion of a building not then open to
the public, with intent to commit a felony, theft, or an assault; or remains concealed,
with intent to commit a felony, theft, or an assault, in a building or habitation; or 
enters a building or habitation and commits or attempts to commit a felony, theft, or
an assault. See Tex. Penal Code Ann. § 30.02 (Vernon 2003). A defendant's
unexplained possession of property recently stolen in a burglary permits an inference
that the defendant is the one who committed the burglary. Rollerson v. State, 227
S.W.3d 718, 725 (Tex. Crim. App. 2007); see also Espinosa v. State, 463 S.W.2d
8,10 (Tex. Crim. App. 1971) ("Possession of recently stolen property, from a building
which was left closed, is sufficient to support the conviction for burglary with intent
to commit theft."). 

 Here, the State presented testimony from the complainant that he discovered
his house had been burglarized and watched three persons loading vehicles with his
possessions. The police testified that the complainant's house showed signs of forced
entry when he inspected it. Appellant possessed the jump drive obtained during the
burglary of the complainant's house. He also possessed a pawnshop ticket for a ring
obtained during the burglary of the complainant's house. 

 Police recovered the complainant's jump drive and a pawn shop receipt from
appellant. Appellant told police that he obtained the jump drive from the complainant
and then told police that Turner had given him the items and that he had never entered
the complainant's house. The complainant's wife accompanied police to a pawnshop
where they recovered a ring she owned. Police discovered that appellant had left his
picture identification number with the pawnshop when he pawned the ring. The State
also presented testimony from Deputy Pikett. He testified that his bloodhound alerted
to appellant's scent when he performed a scent lineup using samples taken from the
music room where the complainant kept his safe, his credit cards, his jump drive, his
electric guitars, his MP3 player, and his checkbook. 

 Appellant presented testimony from Turner. Turner testified that appellant
never entered the house and that appellant was babysitting at the time of the burglary
in spite of his earlier stipulation in his guilty plea that he had committed the crime
with appellant. He also testified that he gave appellant several items from the
burglary, including several rings. Appellant also presented testimony from Hall. She
testified that she saw appellant babysitting his child at 8 a.m and at 10:30 a.m on the
morning of the burglary. 

 The jury was in the best position to assess the credibility of the witnesses.
Marshall, 210 S.W.3d at 625. Moreover, because he possessed several items
obtained during the burglary, the jury was permitted to make an inference that
appellant participated in the burglary. See Rollerson, 227 S.W.3d at 725; Espinosa,
463 S.W.2d at 10. We cannot say, therefore, that the evidence presented was so
weak as to render the verdict clearly wrong or manifestly unjust. See Lancon, 253
S.W.3d at 705. We hold that the evidence presented at trial was factually sufficient
to sustain appellant's conviction for burglary. See Lancon, 253 S.W.3d at 704;
Rollerson, 227 S.W.3d at 725; Espinosa, 463 S.W.2d at 10. We overrule appellant's fourth point of error. 









Conclusion


 We affirm the judgment of the trial court. 







 Evelyn V. Keyes

 Justice


Panel consists of Justices Keyes, Hanks, and Bland.

Do not publish. Tex. R. App. P. 47.2(b).
1. See Tex. Penal Code Ann. § 30.02 (Vernon 2003).